USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-23-15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATTHEW SERY,

       Plaintiff,

    - against -

DAVID MEDINA, et al.,

       Defendants.

**OPINION & ORDER**

**13-CV-165 (RLE)**

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

On January 8, 2013, Matthew Sery ("Sery") brought this action seeking damages from Defendants David Medina ("Medina"), Alex Tapia ("Tapia"), and 3D Music Group LLC ("3D Music") (collectively, "Defendants"). (Doc. No. 1.) On February 25 and 26, 2015, the Court held a bench trial. For the reasons that follow, the Court finds that Sery has proved his claims and awards damages against Defendants in the amount of $430,000 plus $138,306.99 in interest, as well as reasonable attorneys' fees.

## II. BACKGROUND

### A. Procedural History

On January 8, 2013, Sery filed a Complaint (1) seeking enforcement of a promissory note; and (2) alleging breach of contract, (3) fraud and fraudulent inducement, (4) unjust enrichment, and (5) entitlement to attorneys' fees. (Doc. No. 1) On July 5, 2013, Defendants answered and filed counterclaims alleging: (1) fraud; (2) breach of constructive trust; and (3) breach of contract. (Doc. No. 38.) Following Sery's Motion to Dismiss Defendants' Counterclaims, the Honorable Alvin K. Hellerstein dismissed Defendants' counterclaim for breach of constructive trust on August 15, 2013. (Doc. No. 52.) On August 26, 2013, Sery

answered the remaining counterclaims. (Doc. No. 53.) On October 3, 2014, the Parties

consented to the jurisdiction of the undersigned for all purposes, pursuant to 28 U.S.C. § 636(c).

(Doc. No. 58.), and the Court held a bench trial on February 25 and 26, 2015.

**B. Facts[1]**

Sery met Medina and Tapia in early 2007. (February 25, 2015 Trial Transcript ("Feb. 25

Tr.") at 16, 179, 180; February 26, 2015 Trial Transcript ("Feb. 26 Tr.") at 96.) Sery operated a

recording studio in Manhattan, which he leased and equipped at his own expense. (Feb. 25 Tr. at

14-15; Feb. 26 Tr. at 96.) Medina and Tapia told Sery that they were up-and-coming record

producers with promising careers and high-level connections in the music industry. (Feb. 25 Tr.

at 16, 25-26, 48; Feb. 26 Tr. at 145-46.) When they initially met in February 2007, Medina and

Tapia informed Sery that they were working on deals with major producers, including Timbaland

and Pharrell Williams. (Feb. 25 Tr. at 16.) Sery, Medina, and Tapia started working together

that same year. (*Id.* at 26-28, 31.) Sery financed the recording studio operations, while Medina

and Tapia worked on their recording projects in Sery's studio. (*Id.*) Together the three formed a

company called 3D Music Group, LLC. (Plaintiff's Exhibit ("P. Ex."). 4.) The relationship

between the three continued and evolved through the course of five successive contracts from

2007 through 2012. (Feb. 25 Tr. at 16; P. Exs. 1, 4, 5, 7, 8.)

Sery's description of the evolution of the business relationship between the parties differs

from that of Tapia and Medina. As Sery describes it, he was an investor in Tapia and Medina's

recording business. Throughout their five-year relationship, Sery provided Defendants with

regular "advances," always with their assurances that a big payout was near. Throughout the

business relationship, Tapia and Medina made representations to Sery that they had connections

---

[1] Facts have been primarily drawn from the testimony and exhibits of Sery. As explained below, the Court finds Sery's account more credible than Defendants'.

to, were working with, or were in the process of entering lucrative contracts with, various recording artists, producers, and corporate entities. In addition to record producers Timbaland and Pharrell Williams; Tapia and Medina mentioned recording artist J. Cole; booking agency AM Only and its client DJ Skrillex; music publisher EMI; and record labels Dreamville and Universal Music Group.  (Feb. 25 Tr. at 16, 25, 48-50, 78-80, 83, 95, 97, 100-01, 209-10; Feb. 26 Tr. at 145-46; P. Ex. 6 at 394-95, 400-01, 405-06, 420, 484-85, 487; Defendants' Exhibit ("D. Ex.") G.) In March 2009, the recording studio closed. (Feb 25 Tr. at 15, 201.) Medina and Tapia continued to work in the music industry as both producers and DJs. (*Id.* at 215.) From 2009 until 2012, the Parties continued to have business dealings.

Sery and Defendants describe the nature of the business relationship differently. Sery alleges that he had always been an investor in Defendants' business, and that he continued to invest through 2012, expecting a return on his investments. (*Id.* at 37-47.) Defendants contend that the three had a "partnership," in which Sery supplied the studio and equipment and Defendants supplied the talent, and that the plan had always been to split profits three ways. (*Id.* at 198.) The Court finds that Sery's version of the business relationship is more credible than that of Defendants. At trial, Sery entered into evidence a series of writings that document the Parties' dealings from 2007 to 2012 (Pl. Ex. 1, 4, 5, 7, 8.) Over the five years of the Parties' dealings, the contracts evidence increasing investment by Sery, in return for greater profits. (*Id.*) Each contract bears the signatures of the Parties. (*Id.*)

**C.  Chronology of the Contractual Relationship**

From 2007 to 2012, Sery, Medina, and Tapia signed five contracts.  (Feb. 25 Tr. at 16; P. Exs. 1, 4, 5, 7, 8.)  Although Defendants deny signing the last four contracts, their signatures

3

appear on all five contracts.  (P. Exs. 1, 4, 5, 7, 8.)  In addition, Sery provided records of cell phone text messages between the Parties that support his version of the facts. (P. Ex. 6.)

### 1.  September 7, 2007 Contract (First Contract)

On September 7, 2007, Sery, Medina, and Tapia entered into their first written contract. (P. Ex. 4.)  The contract provided that each individual would receive an equal share (33 1/3%) of the earnings of 3D Music Group, LLC.  (*Id.*)  A notary public stamped and signed the contract on the date of the contract.  (*Id.*)  All three individuals were together during the contract's signing, and both Medina and Tapia admitted to signing the contract.  (Feb. 25 Tr. at 28, 30, 183; Feb. 26 Tr. at 99-100.)  The contract stated that Sery had previously advanced Medina and Tapia $16,000 on or about March 15, 2007, and the contract would run "from September 1, 2007 to September 1, 2008."  (P. Ex. 4.)  The contract further provided, "If any of the three members listed above decides to dishonor the agreements set-forth, he will have breached the contract and will be forced to pay $50,000.00 to each of the other two members.  This will be done within two years of the breach of the contract."  (*Id.*)

After signing the first contract, Medina and Tapia continued to ask Sery for more money, and from 2007 through 2009, Sery continued to advance additional funds. (Feb. 25 Tr. at 35-41.) Medina stated that Sery insisted on keeping things "official" with his record keeping.  (*Id.* at 203.)  On December 16, 2008, Sery wrote two separate checks to Tapia and Medina for $3,000 each.  (P. Ex. 10.)  Sery wrote "two month com. for EMI" in the "re:" section of the checks.  (*Id.*) Sery described these checks as "two months commission for EMI" and as "prepayment for the sessions that we thought were going to be coming in." (Feb. 26 Tr. at 151.)

4

### 2.  February 25, 2009 Contract (Second Contract)

On February 20, 2009, Sery advanced Medina and Tapia an additional $2,000 each. (Feb. 25 Tr. at 45; P. Ex. 3 at 265.)  Because Medina and Tapia kept asking for advances, Sery thought it was best to sign a second contract.  (Feb. 25 Tr. at 43-45.)  On February 25, 2009, the three men met at the Apple Store in the Westchester Mall to purchase new computers for Medina and Tapia and to sign the second contract.  (Feb. 25 Tr. at 45; P. Ex. 5.)  Sery produced an Apple Store receipt for two computers, dated February 25, 2009, and a copy of the contract from the same date with Medina and Tapia's signatures.  (P. Ex. 3 at 134; P. Ex. 5.)

The second contract replaced the previous contract, making the September 7, 2007 contract null and void.  (P. Ex. 5.)  The new contract called for the removal of Sery's name from "3-D Music Group, LLC, as he is an investor, and not a partner in the business."  (*Id.*)  The new contract also increased Sery's share of the profits to 40 percent and confirmed that as of the contract date, Sery had invested $181,500: $98,5000 in advances to Medina and Tapia, and "$83,000 for equipment, construction, maintenance, studio rental, and timeshares for their production partnership."  (*Id.*)  Although Medina and Tapia did not have to reimburse Sery for these advances and expenses, the contract promised Sery a sixty percent return on his total investment, for a total of $290,400.  (*Id.*)  In case of a breach by any party, the contract stated that the breaching party would owe $150,000.  (*Id.*)  Finally, the contract acknowledged that Medina and Tapia each owed Sery $3,500 for money they borrowed that was not related to the business.  (*Id.*)  Sery also agreed to pay Medina and Tapia $1,000 a month for studio management, as long as they were bringing in business to the studio.  (*Id.*)

### 3.  June 6, 2009 Contract (Third Contract)

Medina and Tapia continued to request additional advances so on June 6, 2009, the Parties met in Greenwich, Connecticut, to execute a third contract and for Sery to make another advance. (Tr. Feb. 25 at 58-59; P. Ex. 7.) Defendants testified that they did not specifically recall meeting Sery in Greenwich on June 6, 2009, nor did they recall signing the contract. (*Id.* at 61, 133.) Both acknowledge, however, that the contract bears their signatures. (*Id.* at 60, 133.)

The third contract voided all prior contracts between the parties. (P. Ex. 7.)  This new contract was substantially similar to the second contract, with a few minor changes.  The contract stated that Sery had invested $204,500 up to that date: $98,500 in advances to Medina and Tapia, and $106,000 in miscellaneous expenses.  (P. Ex. 7.)  Medina and Tapia were not required to reimburse Sery for these advances and expenses, but the contract did promise Sery forty percent of the profits generated between the Parties, up to a sixty percent return on his investment.  (*Id.*) Further, in case of a breach by any party, the breaching party would owe $165,000.  (*Id.*) According to the contract, Medina and Tapia also agreed to pay "Sery $6,200 each for money borrowed, that was not part of the investment advance."  (*Id.*)  The contract reiterated that Sery was an investor and not a partner, but did not mention Sery's having to pay Medina and Tapia for studio management work.  (*Id.*)  The contract also stated that Medina and Tapia were to return any computers or equipment that Sery had lent them for business purposes.  (*Id.*)

Sery testified that on the same day of the third contract signing, he made out a check to cash for $8,000, cashed it, and then gave Medina and Tapia each $4,000.  (Feb. 25 Tr. at 60; P. Ex. 3 at 163.)  At trial, Medina did not recall receiving the cash and Tapia denied receiving it. (Feb. 26 Tr. at 61, 134.)  Medina and Tapia's bank statements, however, indicate that they received cash around the same time.  (P. Ex. 3 at 115, 163, 521-22, 530.)  On the same day of the

6

contract, June 6, 2009, Tapia deposited $3,800 in cash into his checking account. (Feb. 26 Tr. at 134-35; P. Ex. 3 at 115, 530.) Two days later, Medina deposited $2,000 into his checking account. (P. Ex. 3 at 521-22, 621.) Tapia denied that the $3,800 deposit was the cash he had received from Sery, but could not identify the source of the deposit. (Feb. 26 Tr. at 135.) Medina also could not recall how he obtained the $2,000 he deposited that day. (*Id.* at 64.)

Sery testified that Medina and Tapia never paid him the $6,200 they owed and never returned the computers or equipment. (Feb. 25 Tr. at 65.)

### 4. April 15, 2010 Contract (Fourth Contract)

According to Sery, on April 15, 2010, the Parties met again in Greenwich, Connecticut, to sign a fourth contract and transfer additional funds. (Feb. 25 Tr. at 66.) The contract, titled as a "Promissory Note," voided prior agreements between the Parties. (P. Ex. 8.) The contract is typed, but contained numerous handwritten strike-outs and changes with the initials "MS," "AT," and "DM" next to the changes. (*Id.*) Medina and Tapia admit that their signatures and initials appear on the contract, but deny signing or initialing the contract. (Feb. 26 Tr. at 64-65, 135-36.)

The first clause of the note stated that Sery promised to pay Medina and Tapia $20,000 on April 15, 2010, $8,000 on June 15, 2010, and an additional $5,000 on July 15, 2010. (Pl. Ex. 8.) Combined with the $11,000 that Sery had "already paid out," by July 2010 he would have paid a total of $46,000. [2] (*Id.*) The second clause, which was crossed out by hand, stated that Medina and Tapia would pay $400,000 to Sery. (*Id.*) Although the Parties crossed out the typed

---

[2] The typed contract stated that Sery would pay $5,000 on June 15, 2010, and $10,000 on July 15, 2010. Those dollar amounts were crossed out by hand and replaced with $8,000 and $5,000, respectively. The total "$46,000" is typed, and apparently was not corrected when the handwritten changes were made.

7

clause above, the identical clause appears handwritten at the bottom of the document. (*Id.*) The

Parties' full signatures and addresses appear alone, on the second page of the contract. (*Id.*)

On the day of the fourth contract signing, Sery paid Medina and Tapia $20,000 as

specified in the contract. (Feb. 25 Tr. at 71-72.) Sery alleged at trial that he gave Medina and

Tapia each a check for $7,500 and paid them the balance by cashing a check for $5,000 and

giving them the cash. (*Id.*) At trial, he submitted bank records that showed the three checks that

were paid from his account, each dated April 15, 2015: one to Tapia, one to Medina, and one to

cash. (P. Ex. 3.) After being shown the checks, Medina and Tapia each admitted at trial that he

remembered Sery writing out a check to him in the amount of $7,500. (Feb. 26 Tr. at 69, 137-

38.)

Sery alleges that Medina and Tapia never paid him any portion of the $400,000 promised

in the April 15, 2010 contract. (Feb. 25 Tr. at 76.) At trial, Sery produced many text messages

between himself and Medina and Tapia in which he asked them about their $400,000 debt. (Pl.

Ex. 6 at 392, 393, 397, 401, 403, 409, 420). In the text messages, Medina and Tapia neither

expressly admit nor dispute that they owe Sery that amount. For example, in one exchange

Medina and Tapia offered to buy used equipment from Sery. (*Id.* at 393.) Sery suggested that

rather than buying equipment, Medina send him "some money, to start paying off the 400K." (*Id.*

at 394.) Medina responded that Sery had to "wait for the budget to open up" but he "figured the

least we could do is buy some equipment while you wait." (*Id.* at 394-95.) In another exchange

Medina responded to Sery's express inquiry about the $400,000 by texting "like I said, we didn't

forget about you . . . you'll get the money we agreed on." (*Id.* at 403.) Tapia responded similarly

to Sery's direct inquiries, at one point texting "if you have some leverage with D [Medina], you

can get everything you want." (*Id.* at 476.)

### 5.  September 28, 2012 Contract (Fifth Contract)

Sery produced a copy of a fifth contract at trial, allegedly bearing his signature and those of Medina and Tapia, and dated September 28, 2012. (Pl. Ex. 1.) During his testimony, Sery explained that in September 2012, Medina asked him for an additional $80,000 investment. (Feb. 25 Tr. at 101.) Medina and Tapia told him that they had just signed a $2.2 million contract with the artist Skrillex. (*Id.*) However, Medina told him that he was concerned that repaying the $400,000 debt would look bad to his "business manager," but if Sery paid him $80,000, Medina's accountant could "juke the books" to make it look like half of the repayment was "early proceeds from the Skrillex tour," and the other half "repayment of the debt." (*Id.*) Sery claims that he agreed to pay the $80,000 because Medina and Tapia promised to pay him $430,000 about a week later. (*Id.*)

Sery alleges that the September 28, 2012 contract memorializes this agreement. (*Id.*)  The Parties met on that date at a Wells Fargo bank in Greenwich, Connecticut. (Feb. 25 Tr. at 21; Feb. 26 Tr. at 77.) The four-page, handwritten contract, titled a "Notice of Debt Acknowledgement," stated that Tapia and Medina owed Sery $430,000, to "be paid in full on Friday, October 5, 2012." (Pl. Ex. 1.) The second page of the contract contains a provision indicating that "the undersigned shall be jointly and severally liable under this note." (*Id.*) The third page contains a provision that, in the event of default, "Tapia and Medina agree to pay Sery 10% interest annually, until the debt is paid in full." (*Id.*) As with the fourth contract, the September 28, 2012 contract is signed on the final page of the document, separate from any provisions. (*Id.*) Medina and Tapia admitted at trial that their signatures appeared on the fifth contract, although both also denied signing the contract. (Feb. 26 Tr. at 77, 138-39.) During his

9

testimony, Tapia said that his signature could have been "put on there by Matt [Sery]." (*Id.* at 139.) The Defendants, however, offered no evidence to support their testimony.

The fifth contract does not reference Sery's $80,000 payment to Defendants. (*Id.*) However, both Sery and Medina testified that on September 28, 2012, Sery gave Medina and Tapia a check for $80,000, made out to 3D Music Group, LLC. (Feb. 25 Tr. at 214; Feb. 26 Tr. at 77.) Sery offered into evidence a copy of the check and a statement from 3D Music Group's Bank of America checking account, showing that an $80,000 deposit was posted on October 1, 2012. (Pl. Ex. 2; Pl. Ex. 3.)

While Sery asserts that the payment was offered as consideration for the fifth contract, Medina and Tapia contend that Sery paid them the $80,000 as settlement for Sery's breach of the Parties' first contract, signed in September 2007. (Feb. 26 Tr. at 82, 124.) Tapia testified that by 2012, Sery no longer had any business dealings with Medina and Tapia. (*Id.* at 124.) Instead, Sery would "crop up every now and again," inquiring about business opportunities. (*Id.*) Around that time in 2012, Tapia said that he told Sery that if he wished to do any further business with him and Medina, Sery would have to "settle the breach of contract from the original agreement that [they] had." (*Id.* at 124-25.)   Under the terms of the 2007 agreement, any partner in breach would be liable for "$50,000.00 to each of the other two members." (Pl. Ex. 4.) According to Tapia, the $80,000 was a compromise between Sery and Tapia. (Feb. 26 Tr. at 125.)  As to the specific nature of the breach, Tapia testified that "the publishing deal that 3D Music was meant to get never manifested because of [Sery's] actions." (*Id.*) He also alleged that the partnership never received any money when Sery was a partner because Sery "would take it all." (*Id.*) Tapia also said that Sery would do "small things" to "sabotage relationships" between 3D Music Group and others. (*Id.*)

### 6.  Text Message Correspondence After the Fifth Contract

At trial, Medina and Tapia did not offer any evidence to corroborate their version of the fifth contract or Sery's $80,000 check. (*See* Feb. 26 Tr. at 140.) Sery, however, offered subsequent text messages as corroborative evidence of his explanation of the fifth contract and as evidence of Medina and Tapia's breach. (Pl. Ex. 6 at 426-31, 435.) From October 1 to October 2, 2012, Sery and Medina exchanged a series of text messages in which they attempted to coordinate a time to meet. In a message from October 1, Sery asked Medina when they would be meeting that day and told him to "make the check out" to Seryous Funn Productions, LLC. (*Id.* at 426.) Medina responded, "I said [tomorrow],[]today is crazy, everything seems smooth tho[ugh]." (*Id.*) Unable to agree on a time, Medina texted that he would call Sery later "to figure it out." (*Id.* at 427.) The next day, Sery asked Medina "can [you] come to Greenwich tom[orrow], or [F]ri[day]? If [you] come [F]ri[day] you can just give me the whole thing." (*Id.* at 428.)  Medina replied, "Ok.[T]omorrow is the pay out meeting so [F]riday should work." (*Id.*) A few minutes later, Sery texted, "ok, so the whole 430K will be given to me[] on [F]ri[day], correct?" (*Id.*) Media responded, "I[']ll let you know exactly what[']s up after the meeting tomorrow." (*Id.* at 429.) The next day, October 3, 2012, Medina texted Sery that their business manager was observing the Jewish holiday, and that his partner was "not to[o] happy," so they would have to "settle it" after the Jewish holiday. (*Id.* at 430.)

The October 5, 2012 deadline came and went without payment from Medina and Tapia. (Feb. 25 Tr. at 107-8.) On October 9, 2012, Medina texted Sery that he could meet at 10:00 p.m. that night with his accountant so that the accountant could explain to Sery "what he[']s trying to do." (Pl. Ex. 6 at 432.) Medina continued, "[I] don't want you to think I'm pulling your leg." (*Id.*) Medina told Sery to email him "that paper you put together" before the meeting because the

11

accountant wanted to see it before they met. (*Id.* at 433.) When Sery responded that he was already on the train, and asked whether he could send the contract after the meeting, Medina suggested meeting later that week "with the paper." (*Id.* at 434.) Sery then asked why another contract was needed, if Medina would be paying him in full within the next two weeks. (*Id.*) Tapia said he would call Sery. (*Id.*) The next day, after they had apparently failed to connect over the phone, Medina told Sery not to worry about the accountant, saying the "accountant is on our side[.] [H]e is just trying to juke the books." (*Id.* at 435.)

On October 22, 2012, Sery's text messages became frantic. He asked Medina for a "firm time, for the notary." (*Id.* at 438.) He explained that "the 80k was most of the money that was in" his account and now he was in "a bad position." (*Id.*) In reply, Medina texted Sery that he was "laundering money just so you can [expletive] get paid," and that he was going behind his business associates backs' "to get you paid." (*Id.*) A few minutes later Sery asked Medina to talk that night, "to get this settled." (*Id.* at 439.) At that point, Media referred Sery to talk to "your partner [A]lex [Tapia]" or "call your lawyer." (*Id.*)

On October 28, 2012, Medina texted Sery, saying "I'll give you your 80k back next week," but that it would take about a week to "reverse what's been done with it." (*Id.* at 442.) Sery asked whether Medina meant that he would give Sery back the $80,000 the next week and the remaining $350,000 later on, "like [they] agreed," or whether "the deal [was] off." (*Id.*) Medina replied only, "[t]he 80." (*Id.*) Five days later, on November 2, 2012, Sery asked Medina to pay him directly out of his account, as that would be "easier and faster." (*Id.* at 444.) Medina, seemingly backing out of his October 28 promise, wrote that "the hurricane set some things back" and that he needed Sery to "sign some documents ending [their] dealings and monies agreed to prior." (*Id.*) Sery clarified, "So, you're saying that you're not going to be paying me,

12

any money, at all?" (*Id.* at 445.) Medina responded, yes, but only until he could "find all the payments" Sery had given the Defendants and "tally it up." (Id. at 446.) However, as Sery testified at trial, he never received any payment toward the $430,000 or return of his $80,000 investment. (Feb. 25 Tr. at 122.)

### III. DISCUSSION

#### A. Sery's Breach of Contract Claim

Sery alleges that Medina and Tapia are liable for breach of the September 28, 2012, promissory note. Under New York law, it is the plaintiff's burden at trial to establish, by a preponderance of the evidence, "(1) the existence of a contract between [the plaintiff] and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

"Under New York law, a valid contract must be supported by consideration and include mutual assent, legal capacity, and legal subject matter." *Found. Ventures, LLC v. F2G, Ltd.*, 08 Civ. 10066 (PKL), 2010 U.S. Dist. LEXIS 81293, *10 (S.D.N.Y. Aug. 11, 2010). Mutual assent is evidenced by the parties' signatures on a written agreement. See *State Bank of India v. Star Diamonds*, 901 F. Supp. 177, 179 (S.D.N.Y. 1995) ("Under New York law, a party is legally bound by his or her signature to a contract."). A signatory to an agreement is bound by its terms unless there is a showing of fraud, duress or some other wrongful act on the part of any party to the contract. *Columbus Trust Co. v. Campolo*, 110 A.D.2d 616, 617 (N.Y. App. Div. 2d Dep't 1985).

Sery has established the existence of a contract between the Parties. The Court finds Sery's explanation of the Parties' September 28, 2012 dealings credible: Sery paid Defendants

13

$80,000 as investment in their business ventures. In exchange Defendants promised to settle their outstanding debt, composed primarily of the promised returns on Sery's previous investments, in the amount of $430,000, within two weeks. Defendants' assent is evidenced by their signatures on the written "Notice of Debt Acknowledgement," and by the text messages presented at trial. There is no suggestion that any of the parties lacked legal capacity. The subject matter of the contract, capital investment in a business venture, is legal.

Although Defendants deny signing this document, they provide no credible evidence of fraud, duress, or another wrongful act by Sery. Defendants argue that the signatures on the September 28, 2012 contract are on a separate page and that their signatures were "put on there by [Sery]." (Feb. 26 Tr. at 139.) The Court does not find this assertion persuasive evidence in light of the evidence presented by Sery.  Thus, the Court finds that Sery has met his burden and has established the existence of the September 28, 2012 contract.

Furthermore, Sery has established by a preponderance of the evidence that he performed his obligations under the contract. At trial, both Defendants admitted that Sery furnished a check for $80,000 on September 28, 2012. (Feb. 25 Tr. at 169; Feb. 26 Tr. at 77.)  Sery presented evidence that showed that amount deposited in 3D Music Group's bank account a few days later. (Pl. Ex. 2; Pl. Ex. 3.) Defendants presented no credible evidence to explain the $80,000 payment. The record also supports a finding of breach on the part of Defendants. Defendants never paid Sery the $430,000 they promised to pay under the terms of the agreement. (Feb. 25 Tr. at 122.)

Finally, Sery has proven that he was damaged by Defendants' failure to perform their obligations under the agreement. Over the course of the Parties' dealings, Sery made significant financial investments in Defendants' business with the expectation that he would receive a return on his investments if the business was profitable. The course of dealings culminated with the

$80,000 payment that he made to Defendants on September 28, 2015, with the expectation that his cumulative investments would be returned in the amount of $430,000. Defendants never fulfilled their obligation under this agreement, causing Plaintiff expectation damages in the amount of $430,000.

Thus, the Court finds that Sery has, by a preponderance of the evidence, established his claim for breach of contract against Defendants.

**B.  Sery's Alternative Claims for Relief**

Sery requests relief under two alternative theories, fraud and fraudulent inducement and unjust enrichment. At trial, Sery did not present any evidence of damages beyond those to which he would be entitled under his breach of contract claim.  The Court therefore does not address the alternative claims.

**C.  Sery's Claim for Attorneys' Fees**

New York substantive law governs whether Sery is entitled to attorneys' fees. *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) (citing *Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 873 (2d Cir. 1994). Under the "American rule," a prevailing party is precluded from recovering legal fees from the losing party, unless the recovery has been "authorized by statute, agreement or court rule." *Gotham Partners, L.P. v High Riv. Ltd. Partnership*, 76 A.D.3d 203, 204 (N.Y. App. Div. 1st Dep't 2010) (citing *U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 3 N.Y.3d 592, 597 (N.Y. 2004). Because this authorization is contrary to the general rule, New York law forbids the court from "infer[ring] a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise." *Mount Vernon City School Dist. v. Nova*

*Cas. Co.*, 19 N.Y.3d 28, 39 (N.Y. 2012) (quoting *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (N.Y. 1989) (emphasis omitted).

Here, the September 28, 2012 contract provides that "[in] the event of default, the undersigned agree to pay all costs of collection and reasonable attorney's fees." (Pl. Ex. 1 at 2.) This language makes unmistakably clear the Parties' intention to shift the fees to Defendants should they default on their promise to Sery. *See Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 302 F. Supp. 2d 177, 178 fn. 1 (S.D.N.Y. 2003) (awarding attorneys' fees to plaintiff based on a contract provision with similar language).  Thus, the Court finds that Sery is entitled to an award of reasonable attorney's fees.

## D. Prejudgment Interest

Plaintiff requests 10% interest per annum from October 5, 2012. (Doc. No. 8-5 at 2.) The availability of prejudgment interest in diversity suits is governed by New York state law. *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993). Interest is recoverable upon damages arising from breach of contract, and that "except for in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y. C.P.L.R. § 5001(a) (CONSOL. 2015). The date from which interest is computed is "the earliest ascertainable date the cause of action existed." *Id.* § 5001(b). Where, as here, an action is grounded in law rather than equity, New York law provides that "interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." *Id.* § 5004. However, when a contract provides for interest to be paid at a specific rate upon default, "the contract rate of interest, rather than the legal rate set forth in [C.P.L.R. § 5004], governs[.]" *NYCTL 1998-2 Trust v. Wagner*, 61 A.D.3d 728, 729 (N.Y. App. Div. 2d Dep't 2009). The law also requires that the court apply a simple, rather than compounded, rate of interest on the

damage award. *Long Playing Sessions, Inc. v. Deluxe Laboratories, Inc.*, 129 A.D.2d 539, 540 (N.Y. App. Div. 1st Dep't 1987).

Here, Sery is entitled to an award of prejudgment interest on the $430,000 in damages arising from his breach of contract claim. The September 28, 2012 contract provides that in the event of default. Tapia and Medina were to pay Sery "10% interest annually, until the debt is paid in full." (Pl. Ex. 4.) October 5, 2012, the date on which Tapia and Medina were to pay Sery under the terms of the contract, and failed to do so, is "the earliest ascertainable date the cause of action existed." *See* N.Y. C.P.L.R. § 5001(b); (Pl. Ex. 4.). Applying a simple interest rate of 10% per annum on the principal damage award of $430,000, from October 5, 2012, to December 5, 2015, the total amount of interest owed is $138,306.99.[3]

### E.  Defendants' Counterclaim for Breach of Contract

Defendants bring a counterclaim against Sery for breach of contract.  Their claim stems from the September 7, 2007 contract signed by the Parties, in which Sery, Medina, and Tapia agreed that each would "receive an equal share (33 1/3%) of the earnings of 3D Music Group, LLC." (Pl. Ex. 4). Defendants argue that Sery breached this contract "when he failed to disclose to the Defendants that he was an investor and not a partner." (Def.'s Post-Trial Mem. at 24.) They argue that by "failing to disclose a material term" (that Sery was an investor), Sery "deprived [] Defendants of a meaningful opportunity to decide for themselves whether or not they were interested in an investment." (*Id.*)

Assuming that such a failure to disclose could constitute a breach of the 2007 contract, the Court does not find Defendants' allegation credible because the Parties' own course of dealings suggest that all Parties understood that Sery was an investor and not a partner. For

---

[3] The Court calculated that $43,000 was due for each of the three full years from the date of breach, plus $9,306.99, or $117.81 for each of the seventy-nine days between October 5, 2015 and December 23, 2015.

instance, Defendants argue that "had they known that the Plaintiff was an investor, they would not have permitted him to deposit all of the monies made through their contacts into Plaintiff's account and would have instead demanded that moneys be deposited into the joint 3D Music [a]ccount to ensure proper accounting." (*Id.* at 24.) However, the fact that earnings were given directly to Sery, rather than deposited in the 3D Music account to be divided into equal shares, indicates that the Parties considered Sery an investor who needed to be paid back for his initial capital investments.

Defendants further posit that Sery is liable for breach of contract in connection to a June 2008 phone call between Sery and an individual from EMI. Defendants argue that Sery did not have permission to call the individual, that Sery told the individual to deposit payment from a contract between 3D Music Group and EMI into Sery's bank account, and that this conversation lost 3D Music Group the EMI deal. (Def.'s Post-Trial Mem. at 25.) Insofar as Defendants are credible that this conversation occurred, they do not articulate how the conversation with EMI constitutes breach of contract. The September 7, 2007 contract does not contain any term that relates to contacting or negotiating with third parties, nor does it contain any term about the bank account into which earnings from the studio were to be deposited. (Pl. Ex. 4.)

Thus, the Court finds that Defendants have failed to prove their counterclaim of breach of contract against Sery.

**F.  Defendant's Counterclaim for Fraud**

Under New York Law, in order for a party to prevail on a claim of fraud, he must show the following by clear and convincing evidence: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v.*

*Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). When a fraud claim stems from a breach

of contract, New York law requires that the fraud claim be "sufficiently distinct from the breach

of contract claim." *Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 306-

307 (S.D.N.Y. 2010), quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, Inc., 98

F.3d 13, 20 (2d Cir. 1996). To demonstrate that the fraud and contract are sufficiently distinct,

the party must either (1) show that there was "a legal duty that was separate from the duty to

perform under the contract"; (2) "demonstrate a fraudulent misrepresentation collateral or

extraneous to the contract"; or (3) "seek special damages that are caused by the

misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc.*, 98 F.3d

at 20.

Defendants, as Counter-Claimants, offer several theories for how Sery's actions

constitute fraud. First, they submit that when the Parties signed the first contract in 2007, Sery

"secretly [knew] within that he was in fact an investor," but led them to believe that he was a

partner. (Def.'s Post-Trial Mem. at 22). As discussed above in the context of Defendants' breach

of contract counterclaim, the Court does not find this assertion credible. Moreover, the allegation

of fraud here is intrinsic to the contract, and thus cannot be the basis of a fraud case under New

York law. *Bridgestone/Firestone, Inc.*, 98 F.3d at 20.

Defendants also argue that Sery fraudulently created a contract on February 25, 2009,

when Sery knew that "the studio would be closing at the end of March." (Def.'s Post-Trial Mem.

at 23). Even accepting Defendants' allegations that Sery "knew" the studio would be closing,

such "knowledge" that a future event may occur is not, alone, a misrepresentation or omission of

a material fact. Moreover, Defendants did not prove any damages that occurred as a result of the

February 25, 2009 contract, nor did they plead any facts that were collateral or extraneous to the

19

terms of the contract itself. Thus, the Court finds that Defendants cannot sustain their counterclaim for fraud under this theory.

**CONCLUSION**

Sery is entitled to a judgment in the amount of $430,000 plus reasonable attorneys' fees and $138,306.99 in interest for the Defendants' breach of the September 28, 2012 contract. Accordingly, judgment is hereby entered in favor of Sery for $568,306.99 with post-judgment interest accruing at the 28 U.S.C. § 1961 rate. With respect to his other claims, relief is denied. Defendants' counterclaims are denied in their entirety. Sery must make his application for an award of fees and costs supported by evidence, in accordance with Federal Rule of Civil Procedure 54(d), within 30 days.

**SO ORDERED this 23rd day of December 2015**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**